We'll move to our third argument of the morning. Turning here to the courtroom. It's appeal number 21-26-14. Lilly, is it a Bubba? Say it again? A baby. A baby, okay, versus the Health and Hospital Corporation of Marion County, I believe. Okay, Mr. Lenkowski, good morning. Good morning. May it please the court, my name is Adam Lenkowski and I am counsel for Ms. Abebe in this matter. We are requesting that this court reverse the district court's order granting summary judgment as to a discrimination claim and as to a retaliation claim. There are basically two problems with the trial court's order here. First of all, it used a timeline in which it considered incidents that had occurred before Ms. Abebe's 2018 appraisal and incidents that had occurred after the 2018 appraisal. Both of those, we think, should not have been considered. Also, the district court relied on kind of a ball of allegations of a particular one, Supervisor Carlos Hernandez, that Ms. Abebe was confrontational, disrespectful, hostile, etc. There was a dispute of fact as to that because there were various emails and notes that were submitted which showed none of this. So, for that reason, we believe that there is a genuine issue of She worked as a dental assistant for Eskenazi Health starting in 2014. She worked in a fairly small clinic with three other dental assistants, two dentists, I believe two hygienists and one or two practice managers. She was, every year she was evaluated using a scale which assigned her points one through four. On those points, she would be eligible for a merit raise if she received a score of two or above. At issue, as I've indicated, is the 2018 appraisal. Ms. Abebe alleged that there were three separate discriminatory acts that made their way into her 2018 appraisal which she believes affected her score, brought it to below 2.0 and resulted in her not receiving a merit raise increase. The first one involved what we've briefed and referred to as the needle incident. This occurred in March of 2018 when a hygienist intentionally left out a needle for Ms. Abebe to clean up. She reported this to her supervisor, Phil Grace James, and later learned that this particular hygienist had left the clinic. She then followed up to see if it was related. She had a meeting and was told that she could follow up with either one of the dentists or another supervisor. She, indeed, instead of herself following up, one of the supervisors followed up with her. Then there was the incident involving an extremely rude dentist who was yelling and screaming at her as well as shoving her. This dentist did the same thing to another employee named Ricky Branham. This incident was addressed and it was resolved. However, as I've indicated, it was brought up again in her 2018 appraisal. Then there was an incident involving dental burrs in which Ms. Abebe was the only employee required to sign a tracking form. There was another employee who was a Hispanic lady who was not required to sign this dental burr March 29, 2019, that was when she had her meeting regarding the appraisal. That was when it was signed off on by Hernandez. There were then a number of other meetings after that which we don't think are really of any particular relevance because the decision as to her score on the performance appraisal had already been made. It is true, as counsel has pointed out, that there were sort of some repetitive allegations in these post-appraisal interviews. However, they were also repetitive in the sense that they were brought up for different reasons. One was a request for a review of her appraisal. Another was she thought she was being harassed and bullied and intimidated, and that was for past reasons as well as new ones. So that was why a number of post-appraisal meetings came up. So on August 31, 2019, Ms. Abebe went to the Equal Employment Opportunity Commission. She then wrote an email to Eva Miles on September 3 that she felt she was being discriminated against. She went back to the EEOC on September 4, and she was put on a performance improvement plan on September 26, 2019. So I think that's a fair summary of the chronology and the events. Where is the race discrimination in any of this, or the national origin discrimination? Well, certainly. As I said, Ms. Abebe is a black Ethiopian. We believe that we can demonstrate discrimination using the McDonnell-Douglas standard. She was meeting her legitimate expectations. Eskenazi has argued that she was not, but this was based on the pre-appraisal and post-appraisal. And then the meetings that I've discussed regarding the needle incident, the email involving the burrs, and the email concerning the dentist, those were all incidents. And then we've also got comparator evidence. We've got Richard Branham, which I've briefly discussed. He was a Caucasian. He was involved in the same incident with the same dentist, and he was not given a subpar evaluation. There was also Daisy Sierra, as I've indicated. She was a Hispanic woman, and she also, as far as we know, was not given any sort of negative appraisal or put on any sort of performance improvement plan. So we believe she was meeting her expectations. There's no evidence that she wasn't. That we've got comparator evidence. When you say that, you mean from a clinical perspective? I'm sorry, could you rephrase the question? I don't understand. Yeah. So when you say she was meeting expectations, my sense is your adversary is going to say, well, what are you talking about? On the clinical front or with respect to the way she was treating others? Because that was the district court's point. The district court's point was, yes, that is correct. Right, that there was no, there's no, I'm looking right at what the district court said. There's no meaningful comparator because there's no identification of anybody else who was treating people in a rude, disrespectful, or gossipy manner. And I think that's kind of putting the cart before the horse in this case, Your Honor, because Eskenazi's arguments that she was rude and treating people in a disrespectful manner are significantly flawed. First of all, all we see in the affidavit of Carlos Fernandez is simply him baldly alleging, well, she was disrespectful, she was gossipy, she was rude. We don't know what that means. I mean, there's effectively no- Why doesn't it just mean what it says? Because it's so broad that there's effectively no way that a plaintiff could overcome that on summary judgment. What we have shown is that there were these emails and meeting notes which do not show anything of the sort. I thought there was deposition testimony about the way she was interacting with people. She denied that she was rude, hostile, or confrontational. She did, but what about from your adversary? Weren't there depositions taken? There were no depositions of Mr. Fernandez or Mr. James, Your Honor. Others? No. So there were no depositions of anybody? Only of Ms. Abebe. Okay. Ms. Minkowski, what is the adverse employment action here? Your adversary indicates that they don't believe there was one. What's your answer? Yes. Your Honor, I believe the answer, and that's a good question, because the way this court has treated performance improvement plans in the past, I don't think it's- Well, the explanation that they've said is it can't be something that's only minimally onerous. And in this case, we've argued that this performance improvement plan was something that was more than minimally onerous. And I assume you're talking about the retaliation claim and not the discrimination claim, because there was an adverse action in that she lost her- she did not qualify for the merit raise. But with respect to the retaliation, it included a lot of the same allegations from the performance improvement plan. It included very broad categories. How long was the performance improvement plan in place? Two weeks. It was issued on September 26, 2019, and it was shortly thereafter, probably within a month or so, it was- it was probably my understanding it was that it was dropped at that point. Okay, so is the adverse employment action that which occurred in the one month it was in effect? That's correct, Your Honor, yes. Finally, with respect to the retaliation, we've indicated that there's a suspicious timing issue, as well as a facially unbelievable explanation in that it was dropped, as well as the existence of comparator evidence, and those are the elements under Stepp versus Covance that this Court has looked at. Okay. Thank you, Mr. Lenkowski. I'll give you a short time for rebuttal after we hear from Ms. Parrish. Thank you. I appreciate it. Sure. May it please the Court, Theresa Parrish on behalf of the Health and Hospital Corporation of Marion County, doing business as Eskenazi Health. In this case, summary judgment was properly granted, and I ask that you affirm summary judgment. You heard from opposing counsel talk about the performance appraisals and how the events from 2016 and 17 were somehow brought up or raised in her 2018 appraisal, and that is not accurate. Carlos Hernandez, who completed the 2018 appraisal, became her clinical manager in 2018. Now, first, I quickly want to run through the history of the performance appraisals because they are relevant in that it shows that consistently over the years of her tenure at Eskenazi Health that it was noted that she needed to improve in several different areas, areas with regards to her professionalism, improving her relationships with her coworkers, and her communication style. In 2016, her appraisal was 1.25 for the first two segments. That's with Eskenazi Health's pride values and with her essential functions and responsibilities. And she met the operational goals, which are objective metrics, and she received a 1.02 in 2016 for that. In 2017, for those first two segments, it was a 1.2, so you see just a little slight dip, and again, she met the operational goals at a 1.02. Now, keep in mind, these are different clinical managers year after year. Now, we get to 2018 with Carlos Hernandez, and for the first two segments, that score is a 1.09, so a dip of .11 with those two disputed segments that she's talking about with respect to the professionalism, her interaction with her coworkers, her communication style. Now, with respect to the operational goals in 2018, she only received a .34 for the operational goals, okay? So what attributed her score to be dipping down from 2016 and 2017 was this dip of a .68 in the operational goals where she had met that in prior years. Now, there are three operational goals. In 2018, she met the first operational goal. The two operational goals that have been an issue in this case, one of them is the patient wait time and the telephone abandonment rating. Now, for the patient wait time in 2018, that metric was not being tracked properly, and so no dental assistant met that metric. So essentially, everyone was deemed, so to speak, right, with a .34. Mrs. Abebe was deemed, and Richard Brenner was deemed, as well as all the other dental assistants. Now, with respect to the telephone abandonment rating, she did not meet that metric in 2018 where she had met that metric in prior years, and it was not until in briefing summary judgment that Abebe now raises an issue with the telephone abandonment rating. All throughout the course in 2019, when she's meeting with management and meeting with the union representative, complaining about Carlos Hernandez, complaining about the needle incident, complaining about this issue with the dentist, complaining about her performance appraisal, she not once says, hey, there's an issue with the telephone abandonment rating. Likewise, during the course of her deposition, when asked about the areas that she disagreed with her 2018 performance appraisal, she didn't mention that at all. It wasn't until after we briefed summary, in the course of briefing summary judgment, that she submitted an affidavit saying, well, you know, there were issues with tracking the phone abandonment rating, but there's no evidence that this purported issue, even if there was a purported issue, that that actually caused a discrepancy with Mrs. Abebe's rating. In fact, what we do have in the record is we have Richard Branham's 2018 performance appraisal, and he met this metric. In the course of our reply brief on summary judgment, what we did say is, you know, even if, even if you give her the benefit of the doubt and add a .34 back for her telephone abandonment rating, and even if you add in the difference, the .11 from 2017 and 18, that dip, she still only gets to a 1.88. She's not going to meet that 2.0 threshold in order to be eligible for a raise. Now, Abebe argues, well, I could have gotten all 4s that year in 2018. Well, that's not what we have here, and that's not what, that's not what the performance appraisals reflect. She never received higher than a 2, and in some years, she received 2s and 1s. Ms. Parrish, could you speak for a moment to this question of adverse employment action, which you raised on page 25, 26 of your brief? Sure. So— What do you see as the adverse employment actions involved in the case, and was there an adverse— Sure. So, first, I'll tackle the one with respect to the discrimination, which is in terms of the performance appraisal. Yeah, it's very vaguely worded here in your brief, and that's why I'm asking about it. Yeah. Sure. So, in terms of, the case law says that the denial of a raise can be an adverse action. So, the key is can be. It doesn't have to be. And in the Harris case that we cited, it says that if an employee is not entitled to additional compensation in the form of a raise, failure to receive that raise is not an adverse action. She was not entitled to a raise in 2019 based upon her score that was below a 2 in 2018. And even if you get—even if the areas that she disputes, if you add that back—if you add that into her score of the 1.43, she's still not going to get to the 2.0 mark to be eligible for the raise. And so that's the basis of saying that she's not—that she was—because she was not entitled to a raise, there could be no adverse employment action. Now, with respect to the retaliation claim, originally plaintiff's complaint said, well, the adverse employment action was the denial of the raise. Well, the record is clear that the first time that she engaged in needy protected activity was when she went to the EEOC in August of 2019. And that date's very important because she received her performance appraisal in March of 2019. So there can be no—there can be no retaliation for the performance appraisal that was received by her and then her going to the EEOC. Did she ever file a charge with the EEOC or receive a right to sue? She did. She did file—so she first went to the EEOC in August. I don't remember the exact date, in August of 2019. And basically she was told by the EEOC, yes, you're complaining about this needle incident, but you are no way tying that to any protected basis. So then what she— Was that sufficient to exhaust the remedy? Well, so what she did is she ended up going back to the EEOC. And she then, after the EEOC said, you've not articulated a protected basis, she then said, oh, well, I think I've been discriminated against based upon my raise. And then she goes back to Eskenazi Health, I believe it's September 3rd or 4th, 2019, and sends the email to HR. And for the first time, ties these incidents to her protected status being her race. So the point with respect to the 2018 performance appraisal, her performance appraisal, that had already been issued, and then she goes to the EEOC. So it's not possible for that to be retaliatory when the protected activity— No, I get that. You're not making any argument under Fort Bend, in other words, that there's no appellate jurisdiction. Correct. No. No, Your Honor. And so then, in the course of briefing summary judgment, the theory of retaliation then shifts once again. It's, well, this performance improvement plan that was apparently discussed with her a month later, so she goes to the EEOC in August 2019. In September of 2019, there's this discussion of a performance appraisal. It was merely discussed with her. It was never formally implemented. It was not signed by anyone. And so, you know, if even it was in effect, even giving plaintiff the benefit of the doubt there, it was in effect for a month, and then it was withdrawn. It wasn't issued. It wasn't signed. And, you know, secondly, with respect to— It seems very strange that the process would get that far, and then it wouldn't be signed. Well, so one key fact that I think that the court needs to be made aware of is, at this point, she had, yet again, another—she had a new clinical manager. Carlos Hernandez left—excuse me, he was promoted to area director in June, June 30th of 2019 was his last day. So she then had a new clinical manager, okay? So, you know, like you had asked plaintiffs' counsel, depositions were—he did not—he did not take any depositions in this case. So yes, I find it to be strange, too, but that's not something that we necessarily need to be—that is my burden to be explaining about. The point being, it wasn't signed off on. It wasn't issued. It wasn't implemented. But she did have, yet again, a new clinical manager. And if anything, that just shows, yet again, there's one more clinical manager that's observing these same issues. So let me make sure I got the—Mr. Lankowski was saying, look, there's no record. There's no emails, et cetera. There's nothing showing, you know, any problematic behavior on her part in the workplace. And I think your overarching response to that is, well, yes, there is. Look at the performance evaluations. Correct. Yes, look at the— So you could say, is your point that the emails don't make any difference at all? She's got—she's got adverse annual employment reviews, especially in 2018. Correct. Looking at the 2018 performance appraisal, coupled with the declaration of Carlos Hernandez, and then also coupled with the fact, you know, there was a meeting in August of 2018, and that was Carlos's encounter with her where she came across as hostile and not solution—not being solution-oriented. She requests—yet again, she was requesting this incident report again when she was told already that she wasn't going to get it. The emails, what the emails show, really just highlights those points because it is throughout 2019 where she's—it's just reinforcing our point of she's bringing up this issue with the Burrs. She's bringing up issues wanting an incident report for something that occurred a year and a half. And that's the point. Her inability to move forward and to drop these issues, that's what was causing, you know, her performance to suffer, her inability to communicate well with others and with management. Okay. We understand your position. Thank you very much. Thank you. Okay. Mr. Lankowski, we'll welcome you back and give you a minute for rebuttal. Thank you, Your Honor. First of all, we cannot assume that Ms. Abebe's difference between 2017 and 2018, you can't just assume that you're going to add those numbers on. For purposes of summary judgment, we have to assume that it was at least possible that she could have received fours on all of them and therefore above 2.0. Second, with respect to the phone abandonment rate, there's no—she was never asked about this in her deposition. That's why it never came up. So there's no issue that that was waived or anything to that effect. Finally, with respect to the meeting in August, what had happened was there had been a number of requests. She had first met with Mr. James, or she had emailed, I believe, Mr. James or Mr. Hernandez about her—about the incident with the hygienist. She then received a response, and then a meeting was set up as a result of that email change. So that wasn't—they were addressing the same thing that had been brought up in her email. It wasn't like she was asking for it twice. So thank you very much, Your Honor. You're welcome. Thanks to both counsel, and we'll take the appeal under advisement.